Michael HENDERSON *v.* STATE of Arkansas

CR 97-53                                        953 S.W.2d 26

Supreme Court of Arkansas
Opinion delivered September 18, 1997
[Petition for rehearing denied October 16, 1997.]

*William C. McArthur,* for appellant.

*Winston Bryant,* Att'y Gen., by: *Brad Newman,* Asst. Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Appellant Michael Henderson was found guilty of capital murder for the shooting death of Billy Little; attempted capital murder of the victim's brother, Arley Little; and aggravated robbery. He was sentenced to life in prison without parole for capital murder.[1] He appeals on grounds of (1) insufficiency of the evidence; (2) trial court error in not suppressing his statement to police officers; and (3) trial court error in allowing hearsay statements from an uncharged co-conspirator. Henderson raises a fourth issue of trial court error in not giving a manslaughter instruction, but he concedes in his brief that our case law renders this issue either moot or harmless error. We agree with him that his statement to deputy sheriffs should have been suppressed, and we reverse and remand for further proceedings.

The events in question occurred on May 7, 1994. At trial, Arley Little testified that he and his brother, Billy Little, owned a used furniture store and that it was common for them to be carrying large amounts of cash. He stated that on May 7, 1994, he and Billy Little met with Larry Harris, who had purchased a refrigerator from them and wanted a refund because the appliance did not function properly. Little explained that he and his brother picked up the refrigerator and loaded it on their truck, refunded the money to Larry Harris, and left for an auction in DeValls Bluff. Arley Little estimated that on that date he and his brother were carrying about $16,000 to $20,000 in cash.

Little further testified that they left the auction in DeValls Bluff and drove into Pulaski County on Highway 70 after 9:00 p.m. At that time, he heard a loud noise and saw that his brother had been shot in the jaw. He testified that a small white car passed them, continued down the road, turned, came back, and fired

---

[1] The jury verdict at sentencing was life without parole for capital murder and six years for attempted capital murder. The judgment and commitment contains only the conviction for capital murder and a sentence of life imprisonment without parole.

again at the truck. On the white car's second pass, his brother was shot in the head and collapsed on his shoulder. He testified that he took control of the truck and continued to drive along Highway 70 when the white car approached from behind and came alongside the truck for a third time. Arley said that shots were again fired into the truck and that the white car continued ahead of them until it took an entrance ramp onto Interstate 40. Arley Little survived the incident without serious injury, but he could not identify any occupants of the white car and was unable to testify as to the precise number of shots fired into the truck. Billy Little died as a result of the gunshot wounds to his head.

Corporal Terry Ward of the Pulaski County Sheriff's Department testified that he spoke with Larry Harris at the sheriff's department on September 27, 1994, and that Larry told him where he could find the gun that was used in the crime. The weapon, a .380 semiautomatic pistol, was retrieved in Lonoke County. Ronald Andrejack, a firearms and toolmark examiner with the Arkansas State Crime Lab, opined that the three bullets retrieved from Billy Little's truck and the shell casings retrieved from Highway 70 were fired from the .380 semiautomatic pistol found by the investigating officers.

The issue of who fired the shots at the Little truck was contested at trial. Corporal Ward introduced a taped statement given by Henderson to Pulaski County deputy sheriffs on September 28, 1994. In that statement, Henderson explained that on May 7, 1994, he and Gary Harris, his cousin and the brother of Larry Harris, planned to rob the Littles. He stated that Gary Harris drove his white Nissan Maxima with Henderson as a passenger and they followed the Little truck after the Littles left the auction in DeValls Bluff. Henderson stated that they pulled alongside the truck to order it to pull over when the truck swerved at them. Henderson explained in his statement: "[H]e swerved at us, things got out of hand, and we passed him after I pulled the trigger the first time, and then, then I freaked out and ah, of course, I didn't want no witnesses, you know, or anything like that, saying that we did it[.]" He stated that Gary Harris drove the vehicle but did not do any of the shooting.

Gary Harris testified at trial for the prosecution and acknowledged that he pled guilty to first-degree murder, attempted capital murder, and attempted aggravated robbery and received a sentence of 80 years' imprisonment for his involvement in the crime. He testified that Henderson and Larry Harris, his brother, planned the robbery and that he only learned of the plan to rob the Littles the day the crime occurred. He stated that his job was to drive his car, the white Nissan Maxima. He admitted that he owned the .380 semiautomatic pistol used in the crime. He stated that they made three passes at the Little truck, and Henderson fired all of the shots.

In his own defense, Henderson testified that he turned 18 on May 4, 1994, and that he was celebrating three days later on the day of the murder by drinking alcohol and taking crystal methamphetamine when Gary and Larry Harris came to him with the idea to rob the Littles. During the robbery attempt, when their car pulled up beside the Little truck, Henderson stated that Gary Harris swerved and the gun "went off." Henderson testified that from that point he "was just freaking out and telling Gary to go on and leave and go[.]" According to Henderson, the remaining shots, which were the fatal shots, were fired by Gary Harris. Henderson maintained at trial that he "did not personally kill Mr. Little."

Also testifying for the defense was Jennifer Collier, Henderson's former girlfriend, who stated that Gary and Larry Harris came to Henderson with the plan to rob the Littles. She testified that she heard Gary Harris say later that he had "shot a round and it felt good."

## I.   Sufficiency of the Evidence

We first address Henderson's contention that the evidence against him was insufficient. We do so because the double-jeopardy clause precludes a second trial when a judgment of conviction is reversed for insufficient evidence. *King v. State*, 323 Ark. 671, 916 S.W.2d 732 (1996); *Jones v. State*, 323 Ark. 655, 916 S.W.2d 736 (1996).

At trial, Henderson moved for a directed verdict on all three counts against him on the sole ground that, while there was sufficient evidence of his intent to rob the Littles, there was no proof that he actually attempted to commit the robbery. Henderson maintains that because the charge was for capital felony murder, which requires the element of a killing in the furtherance of an enumerated felony, proof of attempted robbery was critical. Ark. Code Ann. § 5-10-101(a)(1) (Repl. 1993).

We decline to reach the merits of this issue. Compared to the relatively narrow motion for directed verdict made by Henderson which was limited to the State's failure to prove an actual robbery attempt, Henderson now contends that the State's evidence was insufficient as a matter of law because his conviction rested on two untrustworthy items of evidence: (1) the testimony of an accomplice, Gary Harris, who was also charged in this matter; and (2) his statement to police officers, which should not have been admitted into evidence due to an illegal arrest. Because of this, the State urges that Henderson has changed his sufficiency argument on appeal. We agree.

It is blackletter law that a party cannot change his grounds for an objection or motion on appeal and that parties are bound by the scope and nature of their arguments made at trial. *Evans v. State*, 326 Ark. 279, 923 S.W.2d 872 (1996); *Campbell v. State*, 319 Ark. 332, 891 S.W.2d 55 (1995). In this regard, specific arguments in support of a directed-verdict motion are waived if not made to the trial court and may not be raised for the first time on appeal. *Id.* Following *Evans v. State, supra*, we refuse to consider Henderson's arguments of insufficient evidence made for the first time on appeal.

## II. *Illegal Arrest and Suppression of Statement*

Prior to trial, Henderson moved to suppress his statement to Pulaski County deputy sheriffs as the fruit of the poisonous tree. His point in part was that the underlying arrest was illegal because it was made by deputies from the Pulaski County Sheriff's Department while in Lonoke County, which was outside their territorial

jurisdiction. The trial court denied his motion, and he makes the same argument on appeal.

At the suppression hearing prior to trial, Corporal Terry Ward testified about the circumstances leading up to Henderson's arrest and his statement to Pulaski County deputy sheriffs. He testified that Gary Harris, after confessing to his involvement in the murder, volunteered to wear a body mike in order to implicate Henderson. Corporal Ward testified that he contacted Ernest Bush, who was a member of the Pulaski County Sheriff's Department and who was also a member of the Metropolitan Little Rock Violent Crimes Joint Task Force (MetRock). Detective Bush had been deputized both as a special agent with the F.B.I. and as a U.S. Marshal. He testified that his MetRock duties often caused him to act in an official capacity outside of Pulaski County, and, thus, he had been deputized throughout the state. Detective Bush testified that he acquired a body recording device from the F.B.I. and received permission to do so from his supervisor, F.B.I. Special Agent Peatross. He testified that he was not told by his supervisor to make an arrest; rather, he was given permission to use the recording device. However, he stated that Special Agent Peatross knew that he would be involved in the investigation of the crime.

Corporal Ward testified that the decision was made to arrest Henderson without a warrant in Lonoke County after overhearing his conversation with Gary Harris. It was made, after discussing the matter with a deputy prosecuting attorney, because Henderson told Harris that he would not be taken alive and that there would be a shootout if the police came to his house. Corporal Ward testified that Henderson was taken into custody due to safety considerations. Shortly after his arrest, Henderson waived his *Miranda* rights and gave the statement that was the subject of the suppression motion, wherein he admitted doing all of the shooting. His statement to the deputy sheriffs contradicted his testimony at trial because he placed the blame for the fatal shots on Gary Harris.

The central issue presented by this point is what effect, if any, the presence of Detective Bush, who was also a MetRock deputy and U.S. Marshal, had on the legality of a warrantless arrest by

deputies of the Pulaski County Sheriff in Lonoke County. The State, citing *Logan v. State*, 264 Ark. 920, 576 S.W.2d 203 (1979), argues that the arrest was legal because Detective Bush, who was deputized across the state, participated in Henderson's arrest.

In *Logan*, a Crittenden County deputy sheriff sought to arrest Logan on charges of aggravated robbery while he was in St. Francis County. In order to effect the arrest, deputy sheriffs from Crittenden County requested the assistance of a St. Francis County deputy sheriff. After the arrest, Logan confessed to the crime and consented to a police search of his apartment. At the suppression hearing and on appeal, Logan sought to exclude his confession and the items seized as the fruit of an illegal arrest. This court dismissed the argument in summary fashion: "We need not discuss these contentions, because it is a fair inference from Davis's testimony that Sam Hughes, the St. Francis County deputy, participated in the arrest." *Logan v. State*, 264 Ark. at 922, 576 S.W.2d at 205.

In the instant case, the State argues that, as in *Logan*, Detective Bush participated in the arrest, thus avoiding any illegality. The State also cites this court to the standard of review, which carries a presumption in favor of the trial court's determination that the arrest was legal, with the burden of proving error resting on the appellant. *See Humphrey v. State*, 327 Ark. 753, 940 S.W.2d 860 (1997); *Ross v. State*, 300 Ark. 369, 779 S.W.2d 161 (1989). Henderson, however, directs this court's attention to *Perry v. State*, 303 Ark. 100, 102, 794 S.W.2d 141, 142-43 (1990), where we stated the blackletter law:

> A local peace officer acting without a warrant outside the territorial limits of the jurisdiction under which he holds office is without official power to apprehend an offender, unless he is authorized to do so by state statute. (Citing authority.)

*Id.* After citing *Davis v. Mississippi*, 394 U.S. 721 (1969), this court went on to conclude that evidence obtained as a direct result of an illegal detention was subject to the exclusionary rule.

■ In *Perry*, this court also listed the four instances where the General Assembly had delegated the authority for law enforcement officers to make an arrest outside of their jurisdictions: (1)

"fresh pursuit" cases under Ark. Code Ann. § 16-81-301 (1987); (2) when the police officer has a warrant for arrest, as provided by Ark. Code Ann. § 16-81-105 (1987); (3) when a local law enforcement agency requests an outside officer to come into the local jurisdiction and the outside officer is from an agency that has a written policy regulating its officers when they act outside their jurisdiction, as stated in Ark. Code Ann. § 16-81-106(3)-(4) (Supp. 1995); and (4) when a county sheriff requests that a peace officer from a contiguous county come into that sheriff's county and investigate and make arrests for violations of drug laws pursuant to Ark. Code Ann. § 5-64-705 (Repl. 1993). *Perry v. State,* 303 Ark. at 103, 794 S.W.2d at 143. None of those situations applies to the instant case.

At the time of Henderson's arrest, three things are certain: (1) no federal offense was involved; (2) Detective Bush was not involved in a MetRock operation; and (3) Detective Bush was not given explicit permission by Special F.B.I. Agent Peatross to effect an arrest. While we can infer that he "participated" in the arrest under the reasoning of *Logan v. State, supra,* absent a federal crime or specific authority from his F.B.I. supervisor to make the arrest, Detective Bush had no authority to arrest Henderson for a state crime in Lonoke County. Hence, the arresting officers only had the authority to arrest that is granted a private citizen. *Perry v. State, supra.*

Though we hold that Henderson's arrest was illegal, we still must examine whether that ultimately decides the matter. Before Henderson gave his incriminating statement to the deputy sheriffs in Pulaski County one hour after his arrest in Lonoke County, he was given his *Miranda* warnings. Thus, the question arises whether the *Miranda* warnings salvage a statement made by an accused irrespective of the illegality of the arrest. Though neither Henderson nor the State addresses the case of *New York v. Harris,* 495 U.S. 14 (1990), we feel constrained to do so.

In *New York v. Harris, supra,* police officers entered Harris's home without an arrest warrant, transported him to the police station, read him his *Miranda* rights, and took an incriminating statement. The New York Court of Appeals suppressed the state-

ment as the fruit of a Fourth Amendment violation, and the Supreme Court reversed regardless of the fact that the arrest was made in Harris's home without a warrant in violation of *Payton v. New York*, 445 U.S. 573 (1980). The Court stated:

> We hold that, where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton*.

*New York v. Harris*, 495 U.S. at 21.

The case before us is not a *Harris* situation where the sanctity of the home was at issue. While probable cause clearly existed for Henderson's arrest before his statement was given, comparable to the circumstances in *Harris*, the arresting officers had no authority to make an arrest in a different jurisdiction — Lonoke County. To hold otherwise would countenance a procedure where an arresting officer could, with impunity, effect an arrest outside of his county, bring the accused back to his jurisdiction, and take an incriminating statement so long as the arresting officer advised the accused of his *Miranda* rights before obtaining the statement. We do not believe that *Harris* goes that far, and we decline to sanction police arrests beyond their territorial borders. The policy considerations behind our decision are significant. As we said in *Perry v. State*, supra:

> The traditional concept of territorial jurisdiction for peace officers is a sound one since a local community is best served by the requirement that local officers familiar with local neighborhoods make arrests in the community. *People v. Hamilton*, 666 P.2d 152 (Colo. 1983). If such a concept were not followed a Pocahontas policeman could make an arrest in Paragould, a Texas Ranger could make an arrest in Fordyce, and a K.G.B. agent could make an arrest in Fort Smith. Such a "practice would lead to more violence than it would suppress." *McCaslin v. McCord*, 116 Tenn. 690, 94 S.W. 79 (1906).

*Perry v. State*, 303 Ark. at 103, 794 S.W.2d at 143.

■ ■ We hold that the statement of Michael Henderson given to deputy sheriffs in Pulaski County shortly after an illegal

arrest in Lonoke County must be excluded. It was, therefore, error to receive it into evidence. Nor can we subscribe to the State's alternative argument that sufficient evidence remained at trial irrespective of Henderson's statement to the deputy sheriffs to support a guilty verdict and the sentence. Without Henderson's statement that he alone fired the fatal shots, the jury would be left with a "swearing match" between Gary Harris and Henderson as to who was the trigger man. Though under his own scenario, Henderson was an accomplice to the killing, we cannot say that his status as the actual killer did not influence the jury's verdict of capital murder as opposed to first-degree murder or second-degree murder as well as his sentence of life without parole. We reverse and remand this matter for further proceedings.

▇ There is one final matter that may reoccur on retrial. The prosecutor attempted to have Gary Harris testify about what Larry Harris told him about the plan to rob the Littles. Defense counsel objected on hearsay grounds and because the co-conspirator exception did not apply since Larry Harris had not been charged. We agree with the State that statements by a co-conspirator are not hearsay, if made during the course of and in furtherance of a conspiracy. *See* Ark. R. Evid. 801(d)(2)(v). Moreover, we agree that Rule 801(d)(2)(v) applies when a conspiracy is proved at trial by evidence independent of the statement regardless of whether the declarant is charged as a conspirator. *Pyle v. State*, 314 Ark. 165, 862 S.W.2d 823 (1993), *cert. denied*, 510 U.S. 1197 (1994); *Smithey v. State*, 269 Ark. 538, 602 S.W.2d 676 (1980).

Reversed and remanded.

ARNOLD, C.J., GLAZE, and THORNTON, JJ., dissent.

W.H. "DUB" ARNOLD, Chief Justice, dissenting. I respectfully disagree with the majority opinion that the arrest of appellant was illegal and that the statement made after being apprised of his *Miranda* rights should have been suppressed. First, it is my opinion that the arrest was a lawful arrest. Secondly, even if the arrest was illegal, the statement made by Henderson should not have been suppressed.

Detective Ernie Bush testified that he is a detective with the Pulaski County Sheriff's Department, a deputized U.S. Marshall, and a Deputized Special Agent with the F.B.I. Detective Bush is assigned to MetRock, the Metropolitan Little Rock Violent Crimes Task Force. He further testified that often his duties take him out of Pulaski County, so he was deputized with authority to act throughout the state.

In this case, Special Agent Peatross of the F.B.I., Detective Bush's supervisor, authorized him to use a body recording device on Gary Harris in Lonoke County. Detective Bush was present with other Pulaski County officers in Lonoke County when the device was used and appellant was arrested. At the time of the arrest, Deputy Bush was a duly sworn law enforcement officer with the authority to arrest appellant in any county in Arkansas. He was authorized by his supervisor to participate in the investigation, and his presence along with the Pulaski County officers made the arrest legal following *Logan v. State*, 264 Ark. 920, 576 S.W.2d 203 (1979).

According to *Logan*, the mere presence of an officer with a commission entitling him to make an arrest legitimizes an arrest even if that officer is not the person who actually makes the arrest. The presence and acquiescence of a duly authorized officer is the key to determining whether an arrest is authorized. In this case, Detective Bush was duly commissioned to make arrests in any county in Arkansas. As the majority noted, his presence and participation in Henderson's arrest certainly give an inference that he participated in the arrest. This inference validates the arrest and makes it a permissible arrest pursuant to *Logan*.

Secondly, even if the arrest was unlawful, the statement given by Henderson should not be suppressed. Before Henderson gave any statement, he was advised of his *Miranda* rights at least an hour after his arrest. Henderson then gave the incriminating statement that he fired the gun that killed Billy Little.

In *New York v. Harris*, 495 U.S. 14, 18 (1990), discussed *supra* by the majority, the United States Supreme Court based its ruling upon the fact that the police had probable cause to arrest Harris, so he was not unlawfully in custody when he was taken to the

police station, given his *Miranda* warnings, and interrogated. The Court noted that the existence of probable cause was the defining factor in whether evidence should be suppressed as fruits of an illegal search.

In *Harris*, the Court noted:

> 'We have declined to adopt a 'per se' or 'but for' rule that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest.'

*citing United States v. Ceccolini*, 435 U.S. 268, 276 (1978). Additionally, the Court concluded that *Payton v. New York*, 445 U.S. 573 (1980) "was designed to protect the physical integrity of the home . . . not to grant criminal suspects . . . protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime." *Harris*, 435 U.S. at 17. Once officers have probable cause to arrest, a suspect is not unlawfully detained when taken into custody, regardless of whether the actual arrest was legal. *Id.* at 18.

In *Harris*, the Court examined the cases of *Brown v. Illinois*, 422 U.S. 590 (1975); *Dunaway v. New York*, 442 U.S. 200 (1979); and *Taylor v. Alabama*, 457 U.S. 687 (1982) and determined that these cases stand for the proposition that "indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." *Harris*, 435 U.S. at 19. Such a close relationship occurs when the police wrongly have control of a defendant's person in the absence of probable cause. In an instance where probable cause exists prior to arrest, the police have justification to question a suspect prior to arrest, so "subsequent statement[s] [are] not an exploitation of an illegal entry" into a home or an exploitation of an illegal arrest. *Id.* at 19.

It is undisputed that Henderson was given his *Miranda* warnings and waived those rights. In the case before us, the police did have probable cause to detain Henderson. There is no evidence that the detention violated his Fourth Amendment rights. The majority bases the suppression of Henderson's statement on the fact that the police should not be sanctioned in effectuating arrests

beyond their territorial borders. Despite the fact that I disagree with the majority's conclusion that the arrest was illegal, this should not affect the legitimacy of a statement made once Henderson was in custody. The statement made while Henderson was in custody was not the outcome of an exploitation of his rights guaranteed by the Fourth Amendment.

For the foregoing reasons, I respectfully dissent from the majority opinion and contend that the judgment of the trial court should be affirmed.

GLAZE, J., joins.

THORNTON, J., joins to the extent that the opinion expresses that Henderson's arrest was lawful.