James Randall EFURD *v.* STATE of Arkansas

CR 97-1208 976 S.W.2d 928

Supreme Court of Arkansas
Opinion delivered October 29, 1998

*James R. Marschewski*, Public Defender, for appellant.

*Winston Bryant*, Att'y Gen., by: *Brad Newman*, Asst. Att'y Gen., for appellee.

TOM GLAZE, Justice. Appellant James Randall Efurd and his wife Alisa were charged with first-degree murder for causing the death of their nine-month-old infant daughter, Ollie. Alisa's case was severed, and this appeal involves the State's case against Randall. Randall was seventeen years old at the time of the crime, and was tried and found guilty by a jury which then sentenced him to life imprisonment. He raises six points for reversal. Before addressing those points, we first review the facts surrounding Ollie's death and leading to Randall's arrest and conviction.

On Thursday, February 8, 1996, the Efurds and two friends, Heather Brasuell and Justin Keeney, participated in taking drugs while in the presence of Ollie. Both Brasuell and Keeney related they never saw the Efurds hit Ollie, but did see bruises on her head and a burn on her stomach. They said that both Randall and Alisa blew marijuana smoke in Ollie's face when she cried. About two hours after Brasuell and Keeney left the Efurd's apartment, the Efurds took Ollie to St. Edward's Hospital emergency room because Ollie was experiencing nausea, vomiting, and fever. The attending physician, Dr. James Word, observed various bruises

around the head, so he had a skull x-ray taken. The x-ray showed Ollie's skull was fractured, so Dr. Word ordered a CAT scan of her brain, which indicated subdural hematoma. Alisa told hospital personnel that Ollie had fallen in her crib. Dr. Word reported the injuries to the police, and told the officers that Alisa's story was not consistent with the bruises he saw on the child.

Ft. Smith Police Officer Tony Bowers responded to the report first, and he called Barling Police Officer Tracy Powell and asked Powell to come to St. Edward's to investigate a possible child-abuse case. When Powell arrived at the hospital, a nurse informed him that the medical personnel suspected child abuse. A doctor told Powell he felt it was definitely child abuse, so Powell reported the matter to his supervisor, Lt. James Hamilton. When Powell told Hamilton the Efurds claimed the baby fell over in the baby bed and hit her head, Hamilton asked Powell "to get some pictures of the baby and the baby bed."[1] The Efurds agreed to go to city hall to give a written statement, but Randall first agreed to go with Powell to the Efurds' apartment so Powell could view and photograph the bed. At about 3:00 a.m. on February 9, 1996, Ollie was air lifted to Arkansas Children's Hospital, and the Efurds separated — Powell and Randall went to the Efurds' apartment and Alisa rode with Hamilton to city hall. Hamilton said the reason Randall went in Powell's car to the apartment was because Randall had no car. Randall was never informed that he was not required to accompany Powell. Powell later testified at a pretrial hearing that, at this point in their investigation, the Efurds were not suspects and were free to leave at any time.

Randall permitted Powell to enter the Efurds' apartment, and upon entry, Powell quickly observed drugs and drug paraphernalia. Randall then gave his consent for Powell to search the premises further. Powell took pictures of the baby bed, gathered the drugs and drug paraphernalia, and arrested Randall for possession of drugs and drug paraphernalia. Randall was then taken to city hall at about 4:00 a.m. on February 9. After Officer Powell told

---

[1] Officer Powell's later testimony was that the Efurds initially told him how Ollie had slipped and fallen in the bed, and he also indicated Alisa did most of the talking and Randall did not say a whole lot.

Lt. Hamilton about the drugs and arrest of Randall, Hamilton read Randall his rights and obtained his first taped statement. Randall gave several other statements between February 9th and 12th, which included a statement indicating that Ollie's injuries had been caused in an incident involving the pushing of the baby's "walker" so that her head bumped against a metal door, causing the skull fracture.

Randall's first argument is that, because the officers violated Ark. R. Crim. P. 2.3 by failing to inform him that he was under no obligation to accompany them to the police station to give a statement, the trial court should have suppressed the evidence seized at the Efurds' apartment and the statements given by Randall at city hall.[2] In making his argument, Randall recognizes that, if a police officer has probable cause to arrest, failure to give a Rule 2.3 warning is irrelevant. *See State v. Bell*, 329 Ark. 422, 948 S.W.2d 557 (1997). He submits, however, that no probable cause was shown here because no evidence existed to suggest he had committed a battery on his child. We disagree.

■■ Probable cause exists when there is reasonably trust-worthy information within a law enforcement officer's knowledge that would lead a person of reasonable caution to believe that a felony was committed by the person detained. *Id.* at 430. This court has held that the test for determining probable cause rests on the collective information of the officers, and the fact that an officer was contradictory about whether he had probable cause to arrest is not determinative of the issue. *Id.* The law is well settled that the degree of proof required to sustain a conviction is not required for probable cause to arrest, and it is equally well settled that all presumptions are favorable to the trial court's ruling on the legality of the arrest, and the burden of demonstrating error rests on the appellant. *Humphrey v. State*, 327 Ark. 753, 940 S.W.2d 753 (1997).

---

[2] Rule 2.3 provides as follows: "If a law enforcement officer acting pursuant to this rule requests any person to come to or remain at a police station, prosecuting attorney's office or other similar place, he shall take such steps as are reasonable to make clear that there is no legal obligation to comply with such a request."

At the conclusion of the State's testimony at the suppression hearing, the deputy prosecutor asserted Randall had been arrested for a drug felony before he was taken to the city hall and questioned. The prosecutor further contended that the officers had the opinions of the doctor and other medical personnel that Ollie's injuries resulted from child abuse. To reiterate, the attending physician told the officers that Ollie's injuries were *definitely* the result of child abuse. The officers at this stage of their investigation also knew that the Efurds' story of what happened to Ollie was inconsistent with the type of head injuries Ollie sustained. Yet, the Efurds, by their own rendition of what happened to Ollie, were the only ones who had been with Ollie at the time she sustained the injuries. We cannot say the trial court erred in denying Randall's suppression motion, since under the State's evidence, the officers had strong medical evidence that reasonably led them to believe the Efurds had physically abused their infant, then conjured a false story in an attempt to explain away the baby's injuries. Because the officers possessed probable cause to arrest Randall for child abuse, we need not consider his Rule 2.3 argument.[3]

Randall's next point for reversal is that the lower court erred in admitting into evidence statements that the jail matron, Dee Powell, overheard Alisa and Randall say when the couple visited one another on four different occasions while being detained in the Sebastian County Detention Center. The Efurds were in rooms separated by glass and the jailer was stationed in Alisa's room. Jailer Powell took handwritten notes, but she later typed them and took her handwritten notes home. Jailer Powell was later unable to produce her handwritten notes of the Efurds' visits, so Randall moved to suppress her typewritten rendition of those notes. He argued that the original writings were required under Ark. R. Evid. 1002. That rule provides in relevant part that, to prove the content of a writing, recording or photograph, the original writing is required, except as otherwise provided in these rules or by statute. The original writing is not required, however, if all

---

[3] We also need not discuss Randall's arrest on felony-drug charges and what effect that arrest had on his Rule 2.3 argument.

originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith. Ark. R. Evid. 1004(1).

■ Here, no one asserts Jailer Powell exercised bad faith in losing or destroying her handwritten notes. She, on the other hand, testified that she typed and transcribed without change her handwritten notes, but she simply could not find the handwritten notes after she was asked for them at a pretrial hearing. Based on these facts, we cannot say the trial court abused its discretion in allowing Jailer Powell to testify to those statements she overheard made by the Efurds.

Randall further claims, under Ark. R. Evid. 403, the jailer's typed transcriptions should have been excluded because their prejudicial value outweighed their probative value because her handwritten notes were lost and unavailable. In other words, he asserts that the probative value of the typed notes was weakened by the fact that the handwritten notes were never found and produced by Jailer Powell.

■ Jailer Powell's typed notes certainly had prejudicial value against Randall, since, among other things, they contained numerous remarks and accusations by Alisa that indicated Randall had hurt Ollie on previous occasions, that he had used drugs, and that they traded remarks implicating each other when talking of Ollie's injuries. Obviously, the typed transcripts could also be said to have probative relevance bearing on the Efurds' abusive treatment of Ollie. Nonetheless, Jailer Powell testified that she merely typed without change her handwritten notes as she was instructed by Lt. Hamilton, but when asked for those handwritten notes, she could not find them. Certainly, Powell's credibility and the reliability of the transcriptions were ultimately questions for the jury. Initially, however, it was within the trial court's discretion to weigh and determine the transcripts' probative value against their prejudicial value, and we cannot say the trial court abused its discretion in allowing them into evidence.

In his fourth point, Randall submits the trial court erred in refusing to grant a mistrial when the prosecuting attorney in his opening statement commented on Randall's right not to testify. The opening remark follows:

THE PROSECUTOR: You will have testimony, though, from the defendant, testimony the State will put on through police officers, four statements.

After Randall moved for a mistrial, the trial court promptly cautioned the prosecutor to use the word "statement," rather than "testimony." The prosecutor complied, telling the jury that the State would place into evidence four statements that Randall made to police officers.

■ ■ The law is settled that comment on the failure of a defendant to testify in a criminal case is a violation of the Self-Incrimination Clause of the Fifth Amendment of the United States Constitution, which is applicable to the states by the Fourteenth Amendment. *Griffin v. California*, 380 U.S. 609 (1965). It is also clear that seeming violations may be harmless error when the State can show that they did not contribute to the verdict or that there was no reasonable possibility that the comment might have contributed to the conviction. *Chapman v. California*, 386 U.S. 18 (1967). In determining harmless error, we excise the improper remarks and examine the remaining evidence to determine if it can be shown beyond a reasonable doubt that the error did not influence the verdict. *See Landreth v. State*, 331 Ark. 12, 960 S.W.2d 434 (1998).

In the present case, Randall averred that he had decided to testify prior to the commencement of trial. Randall had discussed the matter with his counsel on at least two occasions, and had talked to others about taking the stand as well. More importantly, however, Randall does not allege on appeal that the prosecutor's remarks made him feel compelled to testify. *Clark v. State*, 256 Ark. 658, 509 S.W.2d 812 (1974).

The evidence at trial also shows beyond a reasonable doubt that, even though the prosecutor's comment could be labeled error, it was harmless and did not influence the verdict. *See Landreth*, 331 Ark. 12, 960 S.W.2d 434(1998). In sum, the State presented unrebutted medical evidence that contradicted all of Randall's contentions as to how Ollie could have been injured. Besides the doctors' unanimous opinions which contradicted Randall's claims that Ollie's head injuries could have been sus-

tained by falling in a crib or bumping her head against a metal door while in a "walker," he also denied ever having seen the multiple bruises and serious head injury the doctors observed early on the morning of February 8th when she was taken by the Efurds to the hospital. However, in one of Randall's four statements, he admitted that he "Hit Ollie in the face. Slapped on her." The medical examiner opined that Ollie had sixteen bruises and had been beaten to death; meanwhile, Randall denied even having seen Ollie with bruises or a serious head injury. Dr. Adalberto Torres attended Ollie when she was admitted to Arkansas Children's Hospital, and it was his opinion Ollie had died as a result of Shaken Impact Syndrome, which occurs when a young child is picked up, shaken vigorously, and eventually struck against a firm object.

■ Finally, while Randall denied some of Jailer Powell's testimony relating his jail conversations with Alisa, Powell said she overheard Randall tell Alisa that, on the night of February 8, 1996, he had been on "crank," and might have hit Ollie with a tire tool. Powell related that he had lied to the "cops" about several ways it [Ollie's injuries] happened, but that he just wacked her in the head.[4] In short, the evidence was overwhelming that Randall physically abused his daughter, and we are unable to say he suffered any harm from the prosecutor's opening remarks.

For his fifth argument, Randall asked for a mistrial when the prosecutor proceeded to play to the jury a tape of the first statement Randall gave to authorities concerning Ollie's injuries. The prosecutor had had the tape transcribed so the jurors could more easily follow the taped version. When listening to the tape, the jurors interjected that the transcript and tape did not match.

Upon investigation, the court discovered that, while the transcript and tape did not match because some material was inadvertently deleted, the jurors had not heard anything they were not intended to hear. After the State corrected its transcription, the trial court instructed the jury that what it had previously heard on

[4] Powell related similar other statements she attributed to Randall, but we need only say that, for the most part, they implicated Randall as the one who struck Ollie on occasion or placed a pillow across Ollie's face when she cried.

the tape was what it was supposed to hear but that the transcript omitted some parts. The trial court informed the jurors that a correction in the transcript had been made and the tape would again be played from its beginning. Without further objection, the jury then heard the tape and followed it by reading the corrected transcript.

 ██ While it could be said that Randall failed to preserve the issue by failing to renew his objection, *Edwards v. State*, 318 Ark. 126, 864 S.W.2d 866 (1993), the trial court corrected any error that might have occurred. As we have repeatedly held, a mistrial is an extreme remedy and should only be granted when there is no chance that the trial can continue without manifest unfairness to the defendant, *Caldwell v. State*, 319 Ark. 243, 891 S.W.2d 42 (1995), or when there has been error so prejudicial that justice cannot be served by continuing the trial. *Davis v. State*, 325 Ark. 96, 925 S.W.2d 768 (1996). A trial judge's denial of a mistrial motion will not be disturbed on appeal absent an abuse of discretion. *Id.* Here, the trial court's explanation to the jury of the inconsistency between the tape and transcript was sufficient to remove any confusion or prejudice it may initially have created. Therefore, we affirm the court's ruling on this point.

In his final argument on appeal, Randall argues that the trial court erred in allowing the jury to see a video in which he is dressed in his orange prison jumpsuit. Randall argues this was prejudicial, as it was a reminder to the jury that he was in jail.

 This court may not consider this argument on appeal because the videotape was not provided in the abstract or the record. In Ark. Sup. Ct. R. 4-2(a)(6), appellants are directed to include exhibits which cannot be abstracted in words with their briefs, unless the requirement is "shown to be impractical and is waived by the court upon motion." In this case the court would need to view the videotape to assess the alleged prejudice. However, there is no motion asking for a waiver of this requirement in this case file. Therefore, this court may not consider this argument. *See Edwards v. State*, 321 Ark. 610, 906 S.W.2d 310 (1995).

Pursuant to Ark. Sup. Ct. R. 4-3(h), the record has been reviewed for adverse rulings objected to by appellant but not argued on appeal. There were no reversible errors.

Affirmed.