Stephen John COLSTON *v.* STATE of Arkansas

CR 01-122                                    58 S.W.3d 375

Supreme Court of Arkansas
Opinion delivered November 8, 2001
[Petition for rehearing denied December 6, 2001.*]

---

* Brown and Hannah, JJ., would grant.

*Montgomery, Adams & Wyatt, PLLC*, by: *Dale E. Adams*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.

RAY THORNTON, Justice. Appellant, Stephen John Colston, entered a conditional plea of guilty to first-degree battery, in violation of Ark. Code Ann. § 5-13-201(a)(3) (Repl. 1997), pursuant to Ark. R. Crim. P. 24.3(b) (2000). The battery charge, a class A felony, was enhanced by Ark. Code Ann. § 5-74-108 (Repl. 1997), engaging in violent criminal activity. The trial court accepted appellant's guilty plea and sentenced appellant to eight years in the Arkansas Department of Correction. Before appellant entered his conditional plea, he filed a motion to suppress. The trial court denied appellant's motion, but allowed him to appeal the adverse determination of the suppression issue. For his sole allegation of error, appellant argues that the trial court erred in denying his motion to suppress his statement based upon an alleged illegal arrest. We affirm the trial court.

## I. Facts

On April 10, 2000, Benton High School principal, John Dedman, reported to the Benton Police Department that a student, K.F., had been stabbed in the abdomen and had been transported to Saline Memorial Hospital for treatment. Witnesses stated that K.F. was getting into a vehicle when a white female asked her if she was "Nap." When K.F. responded in the affirmative, the female began hitting her. H.F., K.F.'s sister, attempted to intervene, and the woman stabbed K.F. with a knife. The young woman swung the knife at H.F., but did not make contact. The woman then got into a nearby van, driven by a white male, and left the scene.

Witnesses at the scene described the woman as an overweight white female with red hair, and the driver as a white male with blond hair who wore a white baseball cap. They also described the van as gray, bearing an Arkansas license place with the number, 090-BTK. A police check of the license plate showed the vehicle belonging to an individual named Colston who lived at 6 Crest Lane in North Little Rock. Law enforcement agencies in Pulaski County were notified of this incident. They attempted to locate the vehicle at that address, but were unsuccessful.

Jim Andrews, a lieutenant with the Saline County Sheriff's Department and supervisor of the Criminal Investigation Division, testified that, on the next day, April 11, 2000, he assisted in the investigating the stabbing incident at Benton High School. After speaking with several witnesses and obtaining the license plate number of the van, he and Sergeant Carty and two investigators headed toward the residence.

On their way to the residence, Detective Mike Frost of the Saline County Sheriff's Department radioed that he was going to Cabot on another related case, and Lieutenant Andrews asked Detective Frost if he would go to the residence because he was so close to the location. Detective Frost was given the descriptions of the two individuals involved at the Benton High School stabbing.

Detective Frost testified that when he got the call from his supervisor, Lieutenant Andrews, he went to the address in North Little Rock under his instructions. He further testified that when he got to North Little Rock, he contacted the Pulaski County Sheriff's Office to determine where the residence was located. When he arrived on the scene, the van was not there, but he saw the name, "Colston," on a wooden name board on the front porch. Detective Frost then advised Lieutenant Andrews of these facts, and Lieutenant Andrews directed the detective to make contact with anyone inside the house.

Detective Frost further testified that when a female who matched the description answered the door, he placed handcuffs on her, placed her inside his vehicle, and took her into custody. She did not, at any time, contest the validity of her detention, but identified herself as Latrina Garris, and told the detective that appellant, Stephen Colston, was asleep inside the residence. Detective Frost contacted the Pulaski County Sheriff's Office and advised them that he needed a deputy at the location to make contact with the subject in the house. The Pulaski County deputy arrived ten minutes after Detective Frost made the call.

When the two officers approached the residence, appellant was at the door. Detective Frost identified himself and told appellant that he was investigating a stabbing incident. He also told appellant that officers from Benton Police Department were en route. Detective Frost then went out to the police car where Garris was. He mirandized her and asked her about the location of the van. She responded that appellant's mother had it at work.

At that time, a gray van pulled into the driveway driven by a woman who identified herself as Gail Colston, appellant's mother. Detective Frost asked her if she had driven the van to work on Monday, April 10, and she stated that her daughter, Elizabeth Colston, had driven her to work at 8:30 a.m. on Monday morning and that her daughter had left the van for appellant to drive that day. Detective Frost then testified that he asked Elizabeth Colston some questions. He stated that she said that appellant had spoken with his cousin, Alex, the previous evening for "a long, long time." She did not hear the conversation.

Detective Frost testified that, after Gail Colston arrived, Lieutenant Andrews and Detective Mike Montgomery of the Benton Police Department and Detective Marvin Hodges of the Saline County Sheriff Department arrived. After Detective Frost advised them of the situation, Detective Montgomery went to the vehicle to see Garris. Detective Frost told the officer that she had been mirandized. According to Detective Frost's testimony, Detective Montgomery asked Garris if she had done the stabbing, and she responded, "I did it." Detective Frost took five photographs of the van and turned the film over to Detective Montgomery.

Detective Frost also testified that Lieutenant Andrews obtained a consent to search from appellant's mother. Detective Frost found a twenty-dollar bill and four ten-dollar bills lying beside appellant's bed. He also found several notes written by Garris to appellant. These items were handed over to Lieutenant Andrews. Detective Frost further testified that he and Detective Montgomery transported Garris while Lieutenant Andrews and Detective Hodges transported appellant to the Benton Police Department.

At the Benton Police Department, Garris confessed that she had stabbed K.F., but had not meant to do so. She stated that she only meant to "beat her ass" because she had "narcked" on some people in court several weeks before. Garris stated that she committed the act for Alex Barnard, appellant's cousin, who paid her $100. Garris said that she had never met K.F. before and knew her only as "Nap." She stated that she pulled the knife after K.F.'s sister jumped on her. She further stated that, after the incident, she left with appellant. She stated that she was paid $100 on that Monday night.

While at the Benton Police Department, appellant stated that he wanted to make a statement. He said that his cousin, Alex Barnard, called him on Sunday night. Appellant spoke briefly with Barnard and handed the telephone to Garris. Appellant stated that

he then fell asleep. He also said that he drove to the school and waited. He saw Garris confront K.F. When he started honking the horn, Garris got in the van, and the two drove back to North Little Rock. Appellant went to work that night, and Garris stayed home.

On cross-examination, Detective Frost admitted that when he was in North Little Rock, he was outside of his jurisdiction. With regard to appellant, Detective Frost stated:

> As my report reflects, [as] the Pulaski County deputy arrived, a white male came to the door and I detained him for investigative purposes. He was not free to leave because he fit the general description that he matched. We did not arrest him *per se* but he was not free to leave the house. I detained him for "investigative purposes" the minute he came to the door. The Pulaski County deputy was with me and we were both walking up on the porch when we saw him. The Pulaski County deputy did not do anything but he was there with me. The van arrived approximately fifteen minutes later. I turned the notes I found over to the Benton Police Department. I was not present when Detective Montgomery advised Mr. Colston of [his] *Miranda* rights.

Detective Mike Montgomery of the Benton Police Department testified that appellant's mother called an attorney, and the attorney spoke to appellant. After Detective Montgomery read appellant his *Miranda* rights, appellant stated that he did not want to make a statement at that point. Detective Montgomery testified that he arrested appellant on the basis that he matched the description of the driver of the vehicle in the Benton High School stabbing.

Detective Montgomery testified that he transported appellant to the Benton Police Department. He stated:

> Stephen's parents wanted to speak with me with Stephen there so the four of us went in an interview room. Stephen's father wanted to know what Stephen could do to help. Just in general conversation, I said I'm not going to talk to him but his cooperation is something that is always taken into consideration. I never attempted to ask Stephen any questions. This took place a half an hour or less. The conversations with his parents concerned the amount of bond, if he were allowed to make bond, what steps they could take, etc. I never told his parents that if he cooperated he would get some specific consideration. There were no promises or deals or guarantees made. As I escorted Stephen to the holding cell, and his parents were going out into the lobby, Stephen asked me,

as I opened the door to his cell, if he could still talk to me. There was no intention on my part of questioning him any more since he had already indicated that he did not want to do that. He told me that he wanted to give me his side of the story so I told him I would listen. We went back to the interview room and I went over another *Miranda* rights form, the same way I went over the last one, having him initial each right [on the form].

Detective Montgomery then recorded the statement on an audio tape and a video tape. Detective Montgomery admitted that there is no mention of an initial request for counsel in the affidavit.

Detective Greg Little of the Benton Police Department also testified at the suppression hearing. On cross-examination, Detective Little testified that he wrote the affidavit for appellant's arrest. He stated, "There is nothing in the affidavit that he declined to make a statement by invoking his right to counsel."

At the suppression hearing, appellant testified on his own behalf. He testified that he remembered being readvised of his *Miranda* rights at the jail at approximately 5:00 p.m. that evening by Detective Montgomery. Appellant stated, "[Detective Montgomery] told me that it would help me out on my charge if I would make a statement. He did not tell me how it would help out. He said he could not help me if he did not hear my side of the story." On cross-examination, appellant testified, "I would agree that if the statement I made was suppressed, it would help my case." Appellant's mother, Gail Colston, testified on her son's behalf at the suppression hearing. Her testimony supports that of the appellant.

After hearing arguments from appellant's counsel and the State, the trial court denied appellant's motion to suppress from the bench. Appellant and the State agreed, pursuant to Ark. R. Crim. P. 24.3, to a conditional plea of guilty. In its order, the trial court states that appellant "will also be allowed to appeal the adverse determination of the suppression issue to the Arkansas Supreme Court and/or Court of Appeals." On appeal, appellant argues that his statement should have been suppressed as the fruit of the poisonous tree of an illegal arrest by officers outside their jurisdiction.

## II. Rule 24.3(b)

This case was certified to us by the court of appeals on the grounds of Ark. R. Crim. P. 24.3(b). Arkansas Rule of Criminal Procedure 24.3(b) provides:

> (b) With the approval of the court and the consent of the prosecuting attorney, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right, on appeal from the judgment, *to review of an adverse determination of a pretrial motion to suppress evidence.* If the defendant prevails on appeal, he shall be allowed to withdraw his plea.

*Id.* (emphasis added).

■ As a general rule, one is not allowed to appeal from a conviction resulting from a guilty plea, aside from jurisdictional defects. Ark. R. App. P.—Crim. 1(a). However, "Rule 24.3(b) presents an exception to the rule but only for the purpose of determining on appeal whether an appellant should be allowed to withdraw her plea if it is concluded that evidence should have been, but was not suppressed." *Wofford v. State,* 330 Ark. 8, 952 S.W.2d 646 (1997). We have strictly construed the permissible scope of an appeal under Rule 24.3(b). In *Wofford,* appellant entered a conditional guilty plea under Rule 24.3(b), and we declined to address an upward departure from sentencing guidelines and an alleged violation concerning cameras in the courtroom because there points did not concern the "suppression of evidence." *Id. See also Jenkins v. State,* 301 Ark. 586, 786 S.W.2d 566 (1990) (declining to reach the merits of a speedy-trial argument when the appellant entered a Rule 24.3(b) conditional plea of *nolo contendere* on the charge).

In *Bisbee v. State,* 341 Ark. 508, 17 S.W.3d 477 (2000), appellant was charged with one count of kidnaping, three counts of rape, and one count of residential burglary. Appellant spoke with law enforcement officials about the abduction during the course of the investigation. Appellant filed a motion to suppress his statement, arguing that the police officers promised him a Coke and a cigarette in exchange for his statements. The trial court denied the motion, finding that appellant had voluntarily waived his rights. Pursuant to Ark. R. Crim. P. 24.3(b), the trial court accepted appellant's conditional guilty plea, which was conditioned upon the State allowing him to appeal the trial court's adverse ruling on his pretrial motion

to suppress. We held that the trial court's findings were not erroneous. *Id.*

■ The facts presented in this appeal are similar to those in *Bisbee, supra*. In *Bisbee*, appellant raised the question of voluntariness of his statement on appeal after his conditional plea was entered. In the present case, appellant raises the issues of extraterritorial jurisdiction and probable cause to effectuate his arrest. Nevertheless, appellant's argument concerns the suppression of evidence as the fruit of an alleged illegal arrest. *See Wofford, supra*. Under Rule 24.3(b), appellant's guilty plea was conditioned upon the State allowing him to appeal "any adverse determination of a pretrial motion to suppress." We interpret the language of this rule to include the validity of an arrest after which a statement was made. For these reasons, we will reach the merits of appellant's point on appeal.

### III. Legality of the arrest

For his sole point on appeal, appellant argues that the trial court erred in denying his motion to suppress his statement because the officers lacked probable cause to make an extraterritorial arrest. Specifically, appellant argues that his statement made after the arrest should have been suppressed under the fruit of the poisonous tree doctrine.

■ As a general rule, there are four instances where officers may arrest outside their territorial jurisdiction: (1) when the officer is in fresh pursuit, under Ark. Code Ann. § 16-81-301 (1987); (2) when the officer has a warrant for arrest, as provided by Ark. Code Ann. § 16-81-105 (1987); (3) when a local law enforcement agency has a written policy regulating officers acting outside its territorial jurisdiction and when said officer is requested to come into the foreign jurisdiction, as stated in Ark. Code Ann. § 16-81-106(c)(3)-(4) (Supp. 1995); and (4) when a sheriff in a contiguous county requests an officer to come into his county to investigate and make arrests for violations of drug laws, pursuant to Ark. Code Ann. § 5-64-705 (Repl. 1993). *Perry v. State*, 303 Ark. 100, 794 S.W.2d 141 (1990). The traditional concept of territorial jurisdiction for peace officers is a sound one since a local community is best served by the requirement that local officers familiar with local neighborhoods make arrests in the community. *Perry, supra*.

At the outset, we note that the prosecutor below conceded that the Saline County officers arrested appellant outside of their territorial jurisdiction, and that none of the statutory grounds for making an extraterritorial arrest appear to apply to the facts of the present case.

Appellant cites *Henderson v. State*, 329 Ark. 526, 953 S.W.2d 26 (1997) in support of his argument that appellant's arrest was illegal. In *Henderson*, appellant moved to suppress his statement to Pulaski County deputy sheriffs as the fruit of the poisonous tree because his arrest was made by Pulaski County officers while in Lonoke County, which was outside territorial jurisdiction. The State claimed that, because a federal agent who was deputized across the state participated in the arrest, the arrest was valid. We disagreed, holding that there was no federal offense involved, that the federal agent was not involved in the operation, and that the federal agent was not given explicit permission by his superior to effectuate an arrest. *Id.*

*Henderson, supra*, is distinguishable from the present case because no Lonoke County officers were present at the time the Pulaski County officers arrested Henderson. Pulaski County officers, acting in concert with a federal agent, erroneously made the arrest in Lonoke County without the presence of Lonoke County law enforcement because they believed that the presence of the federal agent would legitimize their warrantless arrest. *Id.* Here, Pulaski County officers were on the scene, aiding Saline County officers in their investigation and participating in appellant's arrest.

The facts in this case are more similar to the circumstances in *Logan v. State*, 264 Ark. 920, 576 S.W.2d 203 (1979), where a Crittenden County deputy sheriff sought to arrest appellant while he was in St. Francis County. The deputy sheriffs from Crittenden County sought assistance from a St. Francis County deputy sheriff. *Id.* According to *Logan*, the presence of an officer with full authority to make an arrest legitimizes an arrest. The presence and acquiescence of a duly authorized officer is the key to determining whether an arrest is authorized. *Id.* Justice George Rose Smith, writing for the court, stated, "We need not discuss these contentions, because it is a fair inference from Davis's testimony that Sam Hughes, the St. Francis County deputy, participated in the arrest." *Id.* The court further stated, "Even though it was Officer Davis [from Crittenden County] who actually told Logan that he was under arrest, we think it clear that Officer Hughes [from St. Francis

County] was also present in his capacity as a deputy sheriff and participated in making the arrest." *Id.*

■ Like the circumstances in *Logan, supra,* Pulaski County officers were present and acted in concert with the Saline County officers. Here, the knowledge of appellant's commission of a felony had been reported to the Pulaski County Sheriff's Office, and Pulaski County officers were asked to participate in the arrest. This request for assistance and participation was made three times. First, the Saline County officers reported the offense to Pulaski County officers, who then participated in the efforts to apprehend appellant by going to the address on the day the felony was committed. According to Detective Little's affidavit alleging probable cause, agencies in Pulaski County were notified of the Benton High School incident and attempted to locate the vehicle at that address, but were unsuccessful. Second, Detective Frost called the Pulaski County Sheriff's Office the next day on his way to Cabot for assistance in locating the residence. Third, Detective Frost contacted the Pulaski County Sheriff's Office before the arrest, and advised them that he needed a deputy at the location before making contact with the subject in the house. The Pulaski County deputy arrived ten minutes after Detective Frost made the call, and the Pulaski County deputy was on the scene before appellant was apprehended and arrested. The Pulaski County deputy and Detective Frost went to the door of the house and apprehended appellant, who matched the description of the man who drove the get-away van at Benton High School. For these reasons, we follow *Logan, supra,* as well-established precedent that an arrest is valid when the arresting officer is accompanied by a duly qualified officer of the jurisdiction where the arrest occurs and who thereby participates in making the arrest.

■ In our cases involving the legality of arrests, it is well settled that all presumptions are favorable to the trial court's ruling on the legality of the arrest and the burden of demonstrating error rests on appellant. *Efurd v. State,* 334 Ark. 596, 976 S.W.2d 941 (1998) (citing *Humphrey v. State,* 327 Ark. 753, 940 S.W.2d 753 (1997)). *See also Ross v. State,* 300 Ark. 369, 779 S.W.2d 161 (1989).

■ We hold that the trial court properly denied appellant's motion to suppress the statement. Accordingly, we affirm.

Affirmed.

GLAZE, J., concurs.

BROWN, IMBER, AND HANNAH, JJ., dissent.

TOM GLAZE, Justice, concurring. I concur with the majority holding that appellant Stephen Colston's arrest was legal, but I agree because Detective Mike Montgomery, as a private citizen, had authority to arrest Colston under Ark. R. Civ. P. 4.1(b) and Ark. Code Ann. § 16-81-106(d). Section 16-81-106(d) provides that a private person may make an arrest where he has reasonable grounds for believing that the person arrested has committed a felony. Under this statute and described circumstances, an officer acting outside his jurisdiction has the authority to effect an arrest. *See Perry v. State*, 303 Ark. 100, 794 S.W.2d 141 (1990) (where this court recognized the statutory principle in § 16-81-106(d), but concluded Perry had been arrested on a misdemeanor, making the arrest invalid). In the instant case, the issue is whether Detective Montgomery, acting as a citizen, had reasonable grounds to believe Colston had committed a felony.

Reasonable or probable cause exists when there is reasonably trustworthy information within a law enforcement officer's knowledge that would lead a person of reasonable caution to believe that a felony was committed by the person detained. *Efurd v. State*, 334 Ark. 596, 976 S.W.2d 928 (1998). The degree of proof required to sustain a conviction is not required for probable cause to arrest. *Humphrey v. State*, 327 Ark. 753, 940 S.W.2d 860 (1997).

The first detective to arrive at Colston's house was Mike Frost, who later testified that he located the house where the registered owner of the gray van was said to live. The van was registered to a person named Colston. Arriving at the house, Frost saw the name "Colston" painted on some boards on the front porch, and a light was on inside the house. When Frost knocked on the door, a female matching the description given to the officers answered it; the woman told Detective Frost that her boyfriend was inside the house asleep. The young woman was immediately taken into custody. After about ten minutes had passed and other officers arrived, Colston came to the door. Frost said that Colston matched the description of the driver of the van earlier observed at the scene of the crime. While officers were at the house, Colston's mother arrived driving a gray van matching the description of, and having the same license number as, the one used in the stabbing. Colston's mother told officers that Colston had used her van on the day of the stabbing. Detective Montgomery then arrived at the house and spoke to the woman in custody, who told Montgomery that she had done the stabbing and that Colston had driven the van at the time of the crime. Detective Montgomery testified that he arrested

Colston on the basis that he matched the description of the driver of the vehicle, and the van matched the description of the automobile involved. Based on the foregoing information, Detective Montgomery had reasonable grounds for believing that Colston had committed a felony. Thus, Colston's arrest was legal.

JIM HANNAH, Justice, dissenting. This court in *Henderson v. State*, 329 Ark. 526, 953 S.W.2d 26 (1997) cited *Perry v. State*, 303 Ark. 100, 794 S.W.2d 141 (1990), where we stated the blackletter law:

> A local peace officer acting without a warrant outside territorial limits of the jurisdiction under which he holds office is without official power to apprehend an offender, unless he is authorized to do so by state statute. (Citing authority.)

This court in *Henderson* went on to state:

> In *Perry*, this court also listed the four instances where the General Assembly had delegated the authority for law enforcement officers to make an arrest outside of their jurisdictions: (1) "fresh pursuit" cases under Ark. Code Ann. § 16-81-301 (1987); (2) when the police officer has a warrant for arrest, as provided by Ark. Code Ann. § 16-81-105 (1987); (3) when a local law enforcement agency requests an outside officer to come into the local jurisdiction and the outside officer is from an agency that has a written policy regulating its officers when they act outside their jurisdiction, as stated in Ark. Code Ann. § 16-81-106(3)-(4) (Supp. 1995); and (4) when a county sheriff requests that a peace officer from a contiguous county come into that sheriff's county and investigate and make arrests for violations of drug laws pursuant to Ark. Code Ann. § 5-64-705 (Repl. 1993). *Perry, supra.*

None of these four instances applies to this case. Each instance is based in a statute. The majority creates a new and distinct instance for a warrantless arrest by a law-enforcement officer outside his or her territorial limits, brushing aside the requirement that such arrests may only be made when authorized by statute. The majority then recommends that the General Assembly adopt the newly created instance. The General Assembly has not authorized such an arrest. It should not in any event because such an arrest does not satisfy the requirements of probable cause. By adopting an exception that the mere presence of a local officer makes an otherwise illegal arrest legal, the majority reduces the constitutionally mandated requirement that the arresting officer have knowledge sufficient to support probable cause to a mere formality.

The State admits Detective Frost was utterly devoid of any authority to make the arrest as a police officer. The majority agrees. Yet, as the majority recites, it was Frost who spoke to Colston and took him into custody. The only officer present who had territorial authority to make the arrest was the unnamed and unidentified Pulaski County Sheriff's deputy. Although Frost testified he told the Pulaski County Sheriff's Department of the crime, there is no evidence that this unnamed officer had any knowledge of the crime alleged, let alone knowledge sufficient to constitute probable cause. The deputy never testified. Frost testified the deputy was there for his safety because he had one subject in custody and needed a deputy there to make contact with the other subject still in the house. There is no evidence the unnamed deputy made the arrest. The facts most favorable to the majority are that the deputy arrived, went to the door with Frost, and then stood within the Colston home after Frost detained Colston to insure Colston remained there while Frost went outside to speak with Garris and Colston's mother. Such facts are woefully inadequate to support even speculation that the Pulaski County Sheriff's deputy had knowledge sufficient to support probable cause. Additionally, there is no evidence he participated in the arrest in any meaningful way. The arrest was admittedly made by a police officer outside his jurisdiction and admittedly in violation of the statutes allowing such an arrest. Thus, the arrest is admitted to be illegal.

The Fourth Amendment to the federal constitution includes the right to be free from arrest without probable cause. *Lambert v. City of Dumas*, 187 F.3d 931, 935 (8th Cir. 1999). Probable cause exists if the facts and circumstances within the arresting officer's knowledge were sufficient to warrant a prudent person's belief that the suspect had committed or was committing an offense. *United States v. Magness*, 69 F.3d 872, 874 (8th Cir. 1995). In Arkansas, a local police officer acting without a warrant is without official power to apprehend an offender unless he is authorized to do so by State statute. *Arnett v. State*, 342 Ark. 66, 27 S.W.3d 721 (2000); *Henderson v. State,* 329 Ark. 526, 953 S.W.2d 26 (1997); *Perry v. State*, 303 Ark. 100, 794 S.W.2d 141 (1990); *Logan v. State*, 264 Ark. 920, 576 S.W.2d 203 (1979); *Jackson v. State*, 241 Ark. 850, 410 S.W.2d 766 (1967) (citing, *Ker v. California*, 374 U.S. 23 (1963)). Thus, Frost was without authority to arrest Colston as a police officer. However, the majority finds that because the unnamed local deputy was present, the arrest was legal, citing *Logan v. State, supra*. The holding in *Logan* does not reach so far as the majority asserts. The court in *Logan* found that the local officer participated in the arrest. As is shown by the testimony cited in that opinion, the local

officer was involved in the arrest. He participated and had knowledge of the crime. There was evidence of far more than the mere corporeal presence of a local officer. *People v. Wolf,* 635 P.2d 213 (Co. 1981) is instructive. In that case, the Colorado Supreme Court noted that their statute was intended to limit peace officers, in exercising their arrest powers and their law enforcement efforts, to the territorial limits of their authority and to require that local peace officers be advised and participate in the extraterritorial law enforcement activities of other peace officers. Under *Wolf,* the local officer must be advised and must participate. This must be so because there must be an officer present with authority to arrest who possesses the requisite knowledge of the crime or the arrest fails for a lack of probable cause. This is what is lacking in the present case. Frost made it clear he sought the Pulaski County deputy "due to officer safety." There is no evidence the local officer had any knowledge whatever. Frost then goes on to testify that he arrested and spoke with Colston. There is no evidence the unnamed deputy was advised of anything or participated in the arrest other than being present and providing for the safety of Frost. This opinion is in error and seriously undermines the longstanding and constitutionally mandated requirement of probable cause before a warrantless arrest may be made.

In, *Henderson, supra,* we held that the statement given after the illegal arrest had to be excluded even though *Henderson* was given his *Miranda* rights. The instant case is a *Henderson* situation. Investigating police officers in the Benton Police Department clearly had probable cause for Colston's arrest before his statement was given, but, comparable to *Henderson,* the arresting officer had no authority to make an arrest in a different jurisdiction. Also, as in *Henderson,* Colston made a statement after his illegal arrest and after he had been given his *Miranda* rights.

In *Henderson,* we stated the policy consideration behind our decision was formed in *Perry v. State, supra:*

> The traditional concept of territorial jurisdiction for peace officers is a sound one since a local community is best served by the requirement that local officers familiar with local neighborhoods make arrests in the community. *People v. Hamilton,* 666 P.2d 152 (Colo. 1983). If such a concept were not followed, a Pocahontas policeman could make an arrest in Paragould, a Texas Ranger could make an arrest in Fordyce, and a K.G.B. agent could make an arrest in Fort Smith. Such a "practice would lead to more violence than it would suppress." *McCaslin v. McCord,* 116 Tenn. 690, 94 S.W. 79 (1906).

I also note that the argument might be made that if Frost could not arrest as a peace officer he could as a private citizen. The problem is that his knowledge comes to him by his superior. Frost had no personal knowledge and was not involved in the subject investigation. He was asked to stop at the Colston home by his superior because he happened to be nearby on his way to Cabot. Ark. Code Ann. § 16-81-106(d) provides, "A private person may make an arrest where he has reasonable grounds for believing that the person arrested has committed a felony." In *Partin v. Meyer*, 277 Ark. 54, 639 S.W.2d 342 (1982), this court discussed private-citizen arrest for a felony. Under the common law, a private citizen could arrest someone who had committed a felony in his or her presence. *Partin, supra.* In *Partin,* this court stated:

> Probable cause means that the arresting person must "reasonably suspect" the other person of having committed a felony. "It is enough that the circumstances which the actor knows or reasonably believes to exist are such as to create a reasonable belief that there is a likelihood that the other has committed the felony. In such cases, the public interest in the punishment of a felon requires the other's arrest for the purpose of securing his custody pending investigation." Restatement of the Law, *Torts* (2d), 119, Comments (1965).

In *Partin,* at issue was civil liability for false imprisonment where a motel patron was allegedly accused of stealing $600 from a cash drawer in the lobby. The motel owner denied he had accused her. In any event, this court discussed probable cause for an arrest if it had occurred and noted that the defendant was present at the crime scene, that he knew the theft had occurred, that he knew where he kept the cash, and that he knew the plaintiff had passed through the area alone and had had the opportunity to steal the money. The discussion is helpful in this case because it shows that for a warrantless arrest by a private person there must be some basis in knowledge other than simply being told something occurred; otherwise an arrest might arguably be made based on a story in the news on television. Further, it would also be troubling if a peace officer could assert he was making the arrest as a private person under the facts of this case. It would, in effect, nullify the territorial requirements placed on peace officers by statute and allow arrests anywhere simply by making a claim they were arresting as private citizens rather than as a peace officer.

For the foregoing reasons, I respectfully dissent.

BROWN and IMBER, JJ., join in this dissent.