Larry Joe KIDD *v.* STATE of Arkansas

CR 97-586                    955 S.W.2d 505

Supreme Court of Arkansas
Opinion delivered November 6, 1997

*Madison P. Aydelott, III*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Sandy Moll*, Asst. Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Appellant Larry Joe Kidd was convicted of raping a fourteen-year-old girl and sentenced to forty years in prison. He appeals on two grounds: (1) trial court error in allowing into evidence Kidd's comments which were unduly prejudicial and concerned other bad acts; and (2) trial court error in permitting privileged confidential communications between Kidd and his wife into evidence. The two points are meritless, and we affirm.

The facts in this case are assembled from trial testimony. The fourteen-year-old victim testified that the events occurred in her mobile home in Searcy. On April 28, 1996, she went to bed at about 11:00 p.m. During the night, she heard a person enter her room but assumed it was her mother. A man wearing a ski mask put a pillow over her face and told her to keep quiet. She fought and scratched at the man's face underneath the mask. The man began to choke her and told her that if she fought any more, he would cut her ear off. He bound her wrists and covered her mouth with duct tape. After doing that, he removed the bottoms of her pajamas and underwear and had sexual intercourse with her against her will. She testified that during the rape, the man raised the mask over his eyes, which allowed her to see that he had a fairly close-cut beard. She also testified that the man wore surgical

gloves and removed one of them so he could scrape underneath her fingernails with his fingernail. He said at the time: "I got to get this out from under you so they don't know who I am." The victim said that she struggled with the man throughout the rape.

Once the man left, the victim removed the duct tape from her mouth and called 911 for police assistance though her hands were still bound. The call was forwarded to Deputy Sheriff Randy Still at 3:43 a.m. on the morning of April 29, 1996. The victim waited in the living room of her mobile home until Deputy Still arrived. According to Deputy Still, the victim's hands were bound in front, and she was bleeding from the vaginal area. He first checked on the condition of the victim's mother, who had not been harmed. The victim later told the deputy sheriff that her attacker was a heavy-set man with a close-cropped beard who had bad body odor. She added that he was wearing work boots, a pair of dark pants, and a black ski mask.

The victim was taken to the White County Medical Center for a sexual-assault examination. Dr. Christopher Melton, who performed the examination, testified that there were signs of trauma to the victim's neck and that the presence and location of blood were consistent with the victim's hymen being torn. In his opinion, she had been subjected to a sexual assault.

After the victim returned from the hospital but on the same day, Kidd, who was a neighbor, came to the front door of the mobile home and told the mother of the victim that he was "all doped up" and that he needed medical attention because he had just fallen through a window. Although she could not see Kidd standing outside of her mobile home, the victim testified that she recognized his voice as that of the man who had raped her.

At the crime scene, Deputy Still found tool marks on the front door of the mobile home, indicating that it had been pried open. He further found a footprint outside of the victim's window. Later that day, Detectives Curtis Goodrich and Bill Lindsey of the White County Sheriff's Department went to Kidd's home, where they found him leaving his garage. He had scratches on his face. Kidd agreed to go to the sheriff's department to answer questions, and he did so, accompanied by his wife, Paula Kidd.

Once there, he waived his right to counsel and gave a statement. He also gave the detectives permission to search his residence and allowed them to take samples of his hair, blood, and saliva.

In the first statement Kidd gave on April 29, 1996, he denied any culpability for the rape. He told the detectives that he was taking Prozac and Buzbar for an anxiety condition and was under the care of a physician. He stated: "About two years ago, I was having problems. I hated women, and I thought about rape." Upon searching Kidd's home, the detectives discovered a broken window, which Kidd said caused the scratches on his face because he slammed his head through it that morning. Detective Goodrich testified that he saw no evidence of blood on the broken glass. The detectives later were given dark work pants and work boots by Paula Kidd. A black ski mask was subsequently recovered from Kidd's residence.

On June 19, 1996, Detective Goodrich and Detective Lindsey questioned Kidd a second time. Kidd again denied having raped the victim and stated that he hardly knew her. When told by Detective Goodrich that the victim had said her attacker had a bad problem with body odor, he admitted that he had such a problem. Detective Goodrich then related to the jury: "I asked him while he was standing by the victim's bed, did he have an erection or did he have to have foreplay to get an erection, and he stated he couldn't remember." When asked by the detective whether he told anybody about raping the girl, Kidd said that he had told his preacher that he could have done it. He also stated that he thought about rape and killing in the past and that he had followed people home after work. He added that he had previously been accused of rape in the 1980s on a North Dakota Indian Reservation. He stated that he had had sexual relations with the girl on the reservation but later found out that she was a prostitute and wanted nothing further to do with her. According to Kidd, she accused him of rape as a result. He stated that he was arrested and questioned by police officers but later released.

Edward Valman, chief forensic serologist at the Arkansas State Crime Laboratory, testified that he received the victim's rape kit and found semen, but not sperm, on the vaginal swab. Kermit

Channell, section chief of the State's DNA Laboratory, stated that he tested the vaginal swab but found only DNA consistent with the victim because there were no sperm cells. He testified that the finding of semen without the presence of sperm cells was consistent with the semen's having been deposited by a person who had had a vasectomy.

Paula Kidd, Kidd's former wife, testified that Kidd had had a vasectomy soon after they were married approximately seven years earlier. She further testified that during the early morning hours of April 29, 1996, she was awakened at about 1:30 a.m. by a storm. Kidd was in bed at that time. She said that she woke up again at 3:00 a.m. but noticed that he was not in bed and was nowhere in the house.[1] At 5:00 a.m., Kidd had returned to bed, when she received a telephone call from her sister. Her sister, who was also a neighbor, told her about the rape. Hours later, she noticed that Kidd's face had several scratches that were not there at 1:30 a.m. She also testified that Kidd took a shower that day at 6:00 a.m., which was very unusual because he typically did not get out of bed until 10:00 a.m. She stated that she found his blue work pants and work shirt and a wash cloth in the clothes washer, which was unusual, too, because she normally did the laundry and because he had plenty of clean clothes to wear to work.

## I. Prejudicial Statements

Kidd first contends that the trial court erred in denying his motion for declaration of a mistrial because certain portions of his two statements to the detectives were highly prejudicial, irrelevant, and constituted proof of prior bad acts, all of which violated Rules 402, 403, and 404(b) of the Arkansas Rules of Evidence. Specifically, he refers to the assertion taken from his April 29, 1996 statement: "About two years ago, I was having problems. I hated women and I thought about rape." In addition, he contests two references in his June 19, 1996 statement: (1) that he had thought about rape and killing in the past and followed people home from

---

[1] She admitted that she previously told detectives that Kidd was in bed at 3:00 a.m. in order to protect her husband, who she assumed was innocent at the time. They divorced on October 3, 1996, and she recanted her previous statement.

work; and (2) that he had been accused of rape on a North Dakota Indian Reservation during the 1980s.

The procedural history of Kidd's objections and motions in the trial court in regard to these comments is necessary to decide this first point. Although the abstract of the mistrial motion makes only a cryptic reference to the fact that Kidd's counsel had previously made an objection on this point, the record discloses that immediately prior to trial, Kidd objected to any statements he made about having thoughts of rape and killing and of following people home from work. The basis for defense counsel's objection was that these comments were more prejudicial than relevant under Rule 403 of the Arkansas Rules of Evidence. The trial court overruled the objection.

At trial, the trial court took a recess at the end of the first day of testimony after the conclusion of Detective Goodrich's direct examination, which included testimony about Kidd's two statements given on April 29, 1996, and June 19, 1996. The following day before cross-examination began, defense counsel moved for a declaration of a mistrial because the comments by Kidd in the two statements which are contested in this appeal were admitted into evidence in violation of Rules 402 and 403 of the Arkansas Rules of Evidence. The trial court ruled that the comments were made by Kidd after a valid waiver of his rights and should not be deleted from his statements under Rule 402 or Rule 403.

We first conclude that Kidd made no argument to the trial court that his comments in his two statements in contention in this appeal constituted proof of prior bad acts under Rule 404(b). That argument, accordingly, is procedurally barred. *Henderson v. State*, 329 Ark. 526, 953 S.W.2d 26 (1997); *Evans v. State*, 326 Ark. 279, 931 S.W.2d 136 (1996); *Campbell v. State*, 319 Ark. 332, 891 S.W.2d 55 (1995).

Next, we address whether Kidd's motion for declaration of a mistrial the following day after Detective Goodrich's direct examination was timely. We do not think that it was because the motion was not made at the first opportunity to do so. *See Smallwood v. State*, 326 Ark. 813, 935 S.W.2d 350 (1996). *See also Whitney v. State*, 326 Ark. 206, 930 S.W.2d 343 (1996); *Jones*

*v. State*, 326 Ark. 61, 931 S.W.2d 83 (1996). Had defense counsel objected or made the motion for declaration of a mistrial at the first opportunity during Detective Goodrich's direct examination, steps might have been taken by the trial court to admonish the jury or strike the testimony. We hold that defense counsel simply failed to move in timely fashion for a remedy and, therefore, ran afoul of our rule requiring objections or motions to be made at the time the objectionable matter is brought to the jury's attention. *See, e.g., Smallwood v. State, supra.* The failure to object at the first opportunity disposes of the allegedly prejudicial comments made in Kidd's April 29, 1996 statement and the rape allegation on the Indian reservation contained in his June 19, 1996 statement.

This leaves the question of Kidd's comments about his having thoughts of rape and killing, and following people home from work, which were also contained in his June 19, 1996 statement and which formed the basis for his Rule 403 objection just prior to trial. Before trial, the trial court overruled his objection. Because the objection was in the nature of a motion *in limine*, we deem the issue to be preserved for our review. *See Neal v. State,* 320 Ark. 489, 898 S.W.2d 440 (1995); *Massengale v. State,* 319 Ark. 743, 894 S.W.2d 594 (1995).

Again, Kidd's abstract only makes a glancing reference to the fact that this issue had been previously raised to the trial court. Nevertheless, we choose to address it. On the merits Kidd cannot prevail on this point. Even assuming that these comments were not relevant and were unduly prejudicial under Rule 403, the evidence presented of Kidd's guilt at trial, albeit circumstantial, was overwhelming. This court has stated in the past that when the evidence of guilt is overwhelming, slight errors in the introduction of evidence do not constitute reversible error. *Hicks v. State,* 327 Ark. 652, 941 S.W.2d 387 (1997); *Abernathy v. State,* 325 Ark. 61, 925 S.W.2d 380 (1996); *Rockett v. State,* 318 Ark. 831, 890 S.W.2d 235 (1994); *Greene v. State,* 317 Ark. 350, 878 S.W.2d 384 (1994).

Here, the evidence of Kidd's guilt is significant enough to render any error harmless. There was the victim's physical

description of her attacker as a large man with a close-cropped beard and with pronounced body odor. There was the victim's identification of Kidd's voice. There were the scratches on Kidd's face that had not been there at 1:30 a.m., according to his former wife, but were there later that same day. There were the work boots, dark pants, and ski mask which the attacker wore and which belonged to Kidd. There was the footprint outside the victim's window which matched Kidd's work boot. There was the absence of sperm in the vaginal swab which corresponded with Kidd's vasectomy. And there was Kidd's unusual behavior during the early morning hours of April 29, 1996, when he showered and washed his clothes.

We conclude that there was no reversible error on this point.

## II.  *Confidential Communications*

During the investigation which led to Kidd's arrest and subsequent prosecution, his then wife, Paula Kidd, cooperated extensively with the sheriff's detectives. All told, she gave five statements to the detectives that included communications between her husband and her, such as his revelation that he had been having dreams about doing "bad things" to women. Paula Kidd provided the detectives with a significant amount of evidence, including the black ski mask and his dark pants and work boots, that tended to prove her former husband's guilt. In the words of Detective Goodrich, the assistance provided by Paula Kidd was "instrumental."

Prior to trial, Kidd made several motions regarding marital privilege in connection with Paula Kidd's statements to the detectives. The trial court denied the motions. On appeal, Kidd's argument does not focus on Paula Kidd's testimony at trial because she did not testify as to any confidential communications with him. Rather, his argument is premised on the fact that Detective Goodrich succeeded in having him admit to having had thoughts of rape and killing because Paula Kidd told Detective Goodrich that he had been having these disturbing dreams. Otherwise, the detective would not have known to broach this subject to him, according to Kidd's theory. In sum, Kidd con-

tends that Detective Goodrich testified that Kidd told him certain things due to information gleaned from Paula Kidd when she herself could not have testified at trial.

■ This issue is resolved by Rule 504(b) of the Arkansas Rules of Evidence, which provides that "[a]n accused in a criminal proceeding has a privilege to prevent his spouse from testifying as to any confidential communication between the accused and the spouse." As this court stated in *Halfacre v. State*, 292 Ark. 331, 334, 731 S.W.2d 179, 180 (1987), "Rule 504 is a rule of evidence providing a *testimonial* privilege to an *accused* in a *criminal proceeding*." *Id.* (emphasis in original). In *Halfacre*, which involved the appellant's conviction for aggravated robbery, we held that the marital privilege did not render the appellant's arrest illegal, when his wife contacted police officers and told them that the appellant had just stated to her that he robbed a local hotel. This court noted that the protections of Rule 504 did not attach because the criminal proceedings had not begun when the wife reported her husband's statement to police officers and because she did not testify at trial regarding the confidential communication. *Id.*

■ In the instant case, as in *Halfacre*, Paula Kidd did not testify at trial about any confidential communications made by Kidd. Thus, Rule 504(b), on its face, does not apply.

Affirmed.