NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>Pacific</u> <u>Reporter</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

AARON L. ARREDONDO,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-11380
Trial Court No. 3AN-11-3873 CR

O P I N I O N

No. 2581 — January 12, 2018

Appeal from the Superior Court, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: Callie Patton Kim, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Terisia K. Chleborad, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Craig W. Richards, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, and Allard, Judge.

Judge MANNHEIMER.

Aaron L. Arredondo appeals his conviction for felony driving under the influence. Arredondo's wife Jackie refused to testify at his trial. (She invoked her spousal immunity privilege under Alaska Evidence Rule 505(a).) But the State called Jackie's mother (Arredondo's mother-in-law) to testify about a conversation she had

with Jackie on the night of this incident. During this conversation with her mother, Jackie described a statement that Arredondo had made to her — a statement suggesting that Arredondo had been driving.

Arredondo's attorney objected that Jackie's mother's testimony on this subject was (1) inadmissible hearsay and, in any event, (2) protected by the marital communications privilege codified in Alaska Evidence Rule 505(b). The trial judge overruled these objections and allowed the State to present this testimony.

On appeal, Arredondo renews his objections to this testimony — but for the reasons explained in this opinion, we uphold the trial judge's rulings and we therefore affirm Arredondo's conviction.

*Underlying facts*

In the early morning hours of April 3, 2011, the Anchorage police found Arredondo's truck resting on a steep embankment below the freeway exit where Muldoon Road meets the Glenn Highway. Soon after, the police found Arredondo walking alone; he had keys to the vehicle in his pocket, and he was intoxicated. However, Arredondo told the police that the keys in his pocket were not the only keys to his truck. He stated that he kept a spare set of keys in the vehicle itself, and he declared that someone else had been driving the vehicle.

The primary question litigated at Arredondo's trial was whether Arredondo was the person who was driving his truck when it skidded off the freeway exit and down the embankment — or whether (as Arredondo's attorney argued) it was Arredondo's wife Jackie who was driving the truck.

In fact, this was the primary question litigated at all *three* of Arredondo's trials for this offense. Arredondo's first two trials ended in mistrials when the jury was unable to reach a verdict.

At the third trial, to bolster its case that Arredondo had been driving the truck, the State called Arredondo's mother-in-law, Annette McDole, to testify about a conversation she had with her daughter Jackie (Arredondo's wife).

At the time of these events, Arredondo and Jackie were separated, and Jackie was staying at McDole's house. According to McDole's testimony, Jackie woke up McDole in the early morning hours and reported that Arredondo had just been inside the house. Jackie told McDole that she had awakened to find Arredondo in her bedroom, and that Arredondo said that he needed her help — but in response, Jackie told Arredondo to leave the house.

(As Arredondo correctly notes in his brief, when the prosecutor made his offer of proof concerning McDole's testimony, he made broader assertions about what Arredondo told Jackie. According to the prosecutor's offer of proof, Jackie told McDole that Arredondo asked for her help because he had "wrecked the truck". And later, when McDole gave foundational testimony during *voir dire* examination outside the presence of the jury, McDole said that Jackie reported that Arredondo asked for help "with his vehicle". But when McDole actually testified in front of the jury about her conversation with Jackie, she never asserted that Arredondo had said anything about wrecking the truck, or about needing help with his vehicle — only about needing help for some unspecified purpose.)

Soon after Jackie had this conversation with her mother, a friend of Jackie's arrived at the house. (Apparently, Jackie had already called this friend for assistance before she woke her mother up.) Jackie, McDole, and Jackie's friend then drove to

where Arredondo's truck was resting beside the highway — but the police were already in the process of impounding it.

Arredondo's attorney objected to McDole's testimony about what Jackie said during their conversation. The defense attorney argued that McDole's testimony was inadmissible hearsay to the extent that it was offered to prove the truth of what Jackie said. The defense attorney also argued that whatever Arredondo had said to Jackie was protected by the marital communications privilege codified in Alaska Evidence Rule 505(b).

The trial judge overruled both of these objections and allowed McDole to testify about her conversation with Jackie — including Jackie's statement that Arredondo had asked for her help (although the subject of this help remained unspecified).

The jury convicted Arredondo of driving under the influence, and he now appeals.

*Arredondo's hearsay objection to McDole's testimony*

McDole's testimony was double hearsay: it was offered to prove (1) that Jackie had, in fact, had the prior conversation with Arredondo (the conversation she related to her mother), and (2) that Arredondo had, in fact, asked Jackie for help during this conversation.

When this hearsay issue was litigated in the trial court, the judge found that McDole's testimony was not barred by the hearsay rule because Jackie's statements to McDole fell within the exception for excited utterances codified in Alaska Evidence Rule 803(2). More specifically, the judge found that, at the time of Jackie's initial conversation with McDole, Jackie had just experienced a "startling event" — *i.e.*, Arredondo's early-hour intrusion into her bedroom — and that Jackie "was still under

the stress" of this event when she woke her mother and told her what had happened.  We conclude that the record supports the trial judge's ruling.

When hearsay is offered under the excited utterance exception, "the ultimate question is whether the proponent of the evidence has shown that the circumstances surrounding the utterance produced a condition of excitement which temporarily stilled the speaker's capacity of reflection and produced utterances free of conscious fabrication." *Sipary v. State*, 91 P.3d 296, 305-06 (Alaska App. 2004).  This is a question of fact, and we will uphold the trial judge's conclusion on this issue unless that conclusion is shown to be clearly erroneous.  *Ibid.*

As we have explained, McDole's daughter Jackie was married to Arredondo at the time of this incident, but they were separated, and Jackie was living in McDole's house.  According to McDole's testimony, Jackie awakened her in the middle of the night by shaking her and saying, "Mom".

During her *voir dire* testimony, McDole described Jackie's demeanor at the time as "startled" and "a little shocked".  When McDole was asked whether Jackie was crying or angry, McDole answered, "She was just startled.   ...  I think [she was] more shocked than anything."

When Arredondo's attorney cross-examined McDole outside the presence of the jury, he asked McDole a series of questions about Jackie's mental state at the time of their conversation.  But rather than challenge McDole's assertion that Jackie was "startled" and "shocked", the defense attorney only asked McDole to confirm that Jackie's emotional reaction was mainly in response to Arredondo's unexpected appearance in her bedroom — and not in response to his request for help with his truck:

> *Defense Attorney*:  Isn't it true that if [Jackie] was startled about anything, it was that Aaron [Arredondo] was in the home?

*McDole*:  Yeah, it's a little startling to wake up and find someone that shouldn't be there, standing over you.

*Defense Attorney*:  But ... really, [Jackie's] focus was that he was in the house, correct?  ...  The focus of her waking you up was to let you know that Aaron was in the house, and she wanted him out of there?

*McDole*:  Right.

Thus, the defense attorney did not challenge McDole's assertion that Jackie was "startled" and "shocked" when she made the statements.

Based on this record, we conclude that the trial judge's finding about Jackie's mental state (*i.e.*, Jackie's mental state at the time of her conversation with her mother) is not clearly erroneous.  We therefore affirm the judge's ruling that Jackie's statements to her mother were admissible as excited utterances.

(Because we reach this conclusion, we need not address the trial judge's other two rationales for finding that McDole's testimony was admissible hearsay.)

*Arredondo's argument that McDole's testimony violated the marital communications privilege*

Arredondo argues that even if McDole's testimony did not violate the hearsay rule, her testimony nevertheless violated Arredondo's marital communications privilege — the privilege codified in Alaska Evidence Rule 505(b).

Alaska Evidence Rule 505 encompasses two distinct evidentiary privileges that apply to married couples.  Subsection (a) defines the "spousal immunity" privilege — the right of one spouse to refuse to take the stand in a legal proceeding involving the

other spouse. This privilege belongs solely to the spouse who is being called as a witness, not the other spouse. [1]

As we explained at the beginning of this opinion, Jackie Arredondo invoked the spousal immunity privilege and refused to testify at Arredondo's trial.

Subsection (b) of Evidence Rule 505 defines a separate and distinct evidentiary privilege — the "marital communications" privilege. This privilege does not give spouses the right to refuse to take the stand, but it does give spouses the right to refuse to answer any questions about confidential communications they had with their other spouse during the marriage — and the right to prevent their spouse from answering such questions, even if their spouse would otherwise be willing to answer.

The general rule of privilege is stated in Evidence Rule 505(b)(1):

> Neither during the marriage nor afterwards shall either spouse be examined as to any confidential communications made by one spouse to the other during the marriage, without the consent of the other spouse.

As can be seen from the final clause of this definition, the marital communications privilege belongs to both spouses — both the spouse who is being examined as a witness and the other spouse. Thus, one spouse can effectively veto the other spouse's willingness to testify about their confidential communications.

Arredondo argues that he was entitled to invoke the marital communications privilege to prevent his mother-in-law, Annette McDole, from testifying about her conversation with her daughter Jackie — specifically, the portion of that

---

[1] The general rule of privilege is stated in Evidence Rule 505(a)(1): "A husband shall not be examined for or against his wife, without his consent, nor a wife for or against her husband, without her consent."

conversation in which Jackie informed McDole about Arredondo's statement that he needed Jackie's help.

At first blush, Evidence Rule 505(b) seemingly does not apply to the facts of Arredondo's case. The rule declares that a "*spouse* [shall not] be examined" as to any confidential communication between them and their spouse. But in Arredondo's case, Jackie was not examined regarding any communication she had with Arredondo. Indeed, Jackie refused to take the stand at all (by invoking her spousal immunity privilege). The evidence in question was elicited, not through the testimony of Jackie Arredondo, but rather through the testimony of her mother, Annette McDole.

Several of the more recent appellate decisions in this area have held that statutes worded like our Evidence Rule 505(b)(1) apply only when a spouse is examined about confidential marital communications — and that "the privilege does not prevent another person from testifying to [these] statements", nor does it prevent "the introduction of documents containing references to such communications." Kenneth S. Broun *et alia*, *McCormick on Evidence* (7th ed. 2013), § 82, Vol. 1, pp. 513-14.

*See Kidd v. State*, 955 S.W.2d 505 (Ark. 1997) (holding that a police detective could testify about the defendant's wife's statement to the detective); *People v. Fisher*, 503 N.W.2d 50, 56-57 (Mich. 1993) (upholding the admission of the wife's statement contained in a pre-sentence report); *State v. Clark*, 570 N.W.2d 195 (N.D. 1997) (allowing evidence of the wife's statements to a police officer); *State v. Lindley*, 502 P.2d 390, 391-92 (Or. App. 1972) (same: wife's statements to a deputy sheriff) (relying on the Oregon Supreme Court's decision in *State v. Wilkins*, 142 P. 589, 590 (Or. 1914)); *State v. Bonaparte*, 660 P.2d 334, 336 (Wash. App. 1983) (allowing evidence of the wife's statements to a third person).

Although these decisions are based on statutes or rules that are worded like our Evidence Rule 505(b)(1), we also note that Alaska has a separate rule, Evidence Rule

511, that forbids the admission of privileged communications if they were disclosed "without opportunity to claim the privilege". With regard to the marital communications privilege, *both* spouses hold the privilege. Thus, if Jackie disclosed privileged matters to her mother in circumstances where Arredondo had no opportunity to object, one could argue that the privilege had been breached without Arredondo's having the "opportunity to claim the privilege".

We say only "one could argue", because the meaning of Evidence Rule 511 in this context is itself problematic. Here, Arredondo surprised his estranged wife by appearing unannounced (and uninvited) in her bedroom. Even if Arredondo had remained in the house and had accompanied Jackie when she went upstairs to waken and alert her mother, and even if Arredondo had been present when Jackie began telling her mother about what Arredondo said in the bedroom, it is unclear whether Arredondo could "claim the privilege" and stop Jackie from talking to her mother, or "claim the privilege" and prospectively prevent his mother-in-law from testifying later about what Jackie told her.

We leave these matters undecided because we conclude that we can resolve Arredondo's case without resolving these questions.

Arredondo does not contend that his marital communications privilege would prevent McDole from testifying that Jackie woke her up in the middle of the night, or from testifying that Jackie reported that she had awakened to find Arredondo in her bedroom. Arredondo argues only that his assertion of the marital communications privilege should have barred McDole from testifying "about Jackie's statement ... that Arredondo had asked for her help with his vehicle."

As we have already explained, McDole did *not* testify that Arredondo asked Jackie for help "with his vehicle". This is what McDole said during her foundational

testimony outside the presence of the jury. But when McDole testified in front of the jury, she said only that Arredondo asked Jackie "for help".

Nevertheless, if (as Arredondo argues) the marital communications privilege applied in this situation, then McDole would arguably be prohibited from offering even this truncated version of Arredondo's statement to Jackie.

But we conclude that the marital communications privilege does not apply to Arredondo's statement to Jackie about needing her help.

The marital communications privilege defined in Evidence Rule 505(b)(1) applies only to *confidential* communications between the spouses. Evidence Rule 505 itself does not contain a definition of "confidential communication", but the commentary to Evidence Rule 505(b)(1) declares that this phrase "is analogous to a similar concept [defined] in [the] lawyer-client and [the] physician/psychotherapist-patient privileges" — *i.e.*, it is analogous to the definitions of "confidential communication" found in Evidence Rule 503(a)(5) and Evidence Rule 504(a)(4).

Evidence Rules 503(a)(5) and 504(a)(4) both codify the principle that a communication is "confidential" only if the speaker does not intend for the statement to be disclosed to persons outside the umbrella of privilege. And, indeed, the marital communications privilege has long been construed in accordance with this principle.

As *McCormick on Evidence* explains, even when a marital communication takes place when only the two spouses are present, "a variety of factors, including the nature of the message or the circumstances under which it was delivered, may serve to rebut a claim that confidentiality was intended." Kenneth S. Broun *et alia*, *McCormick on Evidence* (7th ed. 2013), § 80, Vol. 1, p. 508. Thus, for example, the privilege does not apply to communications that relate to business transactions where one spouse will transact the business, or will otherwise deal with third parties, as the agent of the other spouse. *Id.* at 509-510.

See *Schmied v. Frank*, 1882 WL 6459 (Ind. 1882), where the Indiana Supreme Court held that the privilege did not apply to a wife's testimony that she authorized her husband to buy a commercial note as her agent. The court noted that a husband's authority to act on his wife's behalf "is not confidential, nor [is it] intended to be private." Rather, the husband's authority was "intended to be known and would be worthless unless known". *Id.* at *5.

*See also People v. Byrd*, 525 N.W.2d 507, 509 (Mich. App. 1994) (holding that a husband's statements to his wife, delegating to her the authority to sell his marijuana to a third person, were not confidential, and thus not within the privilege); *Lurty's Curator v. Lurty*, 59 S.E. 405, 407 (Va. 1907) (holding that a husband's account of the money owed to his wife from the sale of their joint property was not privileged).

In Arredondo's case, the trial judge could reasonably find that Arredondo's request for his wife's help with his vehicle was not intended to stay private between the two of them. According to the testimony, the vehicle was resting on a steep embankment and it could not be removed without towing equipment. Clearly, Arredondo's wife was not going to locate the truck without Arredondo's assistance, nor could she remove the vehicle single-handedly. Rather, it was reasonable to conclude that Arredondo was seeking his wife's aid in summoning and dealing with third parties who could retrieve the vehicle — so that Arredondo would not have to risk self-incrimination by doing this himself.

This conclusion is supported by the State's offer of proof in the trial court. According to the prosecutor's offer, Jackie and her mother, Annette McDole, showed up at the site of the accident while the police were still there, getting ready to impound Arredondo's truck. Jackie told the officer, "That's my truck" — and when the officer asked her what she meant by that statement, Jackie told the officer that Arredondo had asked for her help with his truck.

Given these facts, Arredondo's request for Jackie's help was essentially a delegation of authority in any dealings with third parties, and not a confidential communication. For this reason, we uphold the trial judge's ruling that the marital communications privilege did not bar McDole from testifying about Arredondo's request for Jackie's help.

We note one other rationale for allowing McDole to testify about Arredondo's statement to Jackie: at Arredondo's trial, his defense attorney wished to use the marital privilege as a sword rather than a shield.

The evidence was uncontradicted that Jackie showed up at the scene of the accident while the police were conducting their investigation. Arredondo's attorney based his trial strategy on the fact that there was no direct evidence concerning how Jackie knew that Arredondo's truck would be at that location, or how she knew that intervention was required. Arredondo's attorney took advantage of this evidentiary gap by expressly arguing to the jury that *Jackie* was the one who drove the truck off the highway exit and down the embankment:

> *Defense Attorney*: Jackie operated the truck. She arrived at the scene; how does she know [where the truck was]? Because she was the one who drove the truck. She's going through a divorce. ... We don't know why people do things that they do. ... [But] we do know ... , through Ms. McDole's testimony, [that Jackie has] knowledge of the spare keys in the truck. She wakes up Mrs. McDole, tells [her that] Aaron needs help, and he was in my bedroom. Then she takes [McDole] to the scene. ...
>
> [Jackie] made a phone call to her friend before she woke up her mother, then they [all] go to the scene. Now how does [Jackie] know where the truck is? Because that's who crashed the truck — her and her friend, Sarah. You heard the 911 recording, the woman on the phone said

"they": "they" may have been driving under the influence; I saw "them" drive off the road.

This is why Aaron Arredondo's not guilty.

Courts have long held that litigants should not be allowed to use evidentiary privileges in ways that affirmatively distort the fact-finding process. "The privilege may implicitly be waived when [a] defendant asserts a claim that in fairness requires examination of protected communications." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2nd Cir. 1991); *see also Clark v. United States*, 289 U.S. 1, 15; 53 S.Ct. 465, 469; 77 L.Ed. 993 (1933) ("The privilege takes flight if the relation is abused.").

Thus, a party waives the marital communications privilege if the party "injects a matter that, in the context of the case, creates such a need for the opponent to obtain the information allegedly protected by the privilege that it would be unfair to allow that party to assert the privilege". *State Farm Mutual Auto. Ins. Co. v. Lee*, 13 P.3d 1169, 1178 (Ariz. 2000). Similarly, a party waives the privilege if the party "selectively disclose[s] part of a privileged communication in order to gain an advantage in litigation". *S.E.C. v. Lavin*, 111 F.3d 921, 933 (D.C. Cir. 1997).

In the present case, Arredondo asserted his marital communications privilege for the purpose of excluding evidence that would have helped to explain how Jackie came to know that Arredondo's truck was sitting disabled on the highway embankment — thus allowing the defense attorney to argue that Jackie's unexplained presence at the accident scene showed that she was the one who drove the truck off the highway and down the embankment.

(The defense attorney had made this same argument at both of Arredondo's earlier trials — the two trials that ended in a mistrial when the jury was unable to reach a verdict.)

Under these circumstances, even if we assume that Arredondo's marital communications privilege might otherwise have given him the right to prevent McDole from testifying about her conversation with Jackie (to the extent that Jackie revealed Arredondo's communications to her), Arredondo's litigation strategy worked a waiver of that privilege. For this reason as well, we uphold the trial judge's ruling on the marital communications privilege.

*Conclusion*

The judgement of the superior court is AFFIRMED.